UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

LUCILLE GOODWIN,

                    Plaintiff,

-vs-                                                          Case No. 6:04-cv-499-Orl-JGG

JO ANNE B. BARNHART,
Commissioner of Social Security,

                    Defendant.
_____/

## MEMORANDUM OF DECISION

        Plaintiff Lucille Goodwin ["Goodwin"] appeals to the district court from a final decision of

the Commissioner of Social Security [the "Commissioner"] denying her application for a period of

disability and disability insurance benefits.  *See* Docket No. 1 (complaint).  For the reasons set

forth below, the Commissioner's decision is **AFFIRMED**.

## I.    PROCEDURAL HISTORY

        On November 26, 2001, Goodwin filed a claim for disability insurance benefits and

supplemental security income benefits, claiming disability as of November 18, 2001.  R. 54.  Her

claims were denied initially and upon reconsideration.  R. 39, 42.  On December 19, 2002, the

Honorable Philemina M. Jones, Administrative Law Judge ["ALJ"], held a hearing on Goodwin's

claim in Daytona Beach, Florida.  R. 255 - 282.  Attorney Richard Swartz represented Goodwin at

the hearing.  R. 255.  The ALJ heard testimony by Goodwin, Tanya Rockmore (a witness) and

Cynthia Patterson (a vocational expert).

On July 23, 2003, the ALJ issued her decision that Goodwin was not entitled to benefits.

R. 16 - 24.  Following a review of the medical and other record evidence, the ALJ found that

Goodwin suffered from several severe impairments: cervical spondylosis, asthma, a history of

hypertension, and she was status post-cerebrovascular accident.  R. 23, Finding 3.  The ALJ found

that Goodwin could not perform her past relevant work as a hotel maid and housekeeping

supervisor.  R. 23, Finding 8.  However, the ALJ found that Goodwin retained the residual

functional capacity to perform a significant range of the physical exertional requirements of

sedentary work.  R. 23, Finding 12.  The ALJ elicited testimony from the vocational expert and

concluded that there were significant numbers of jobs in the national economy that Goodwin could

perform and that, therefore, Goodwin was not disabled.  R. 23, Findings 13 - 14.

After considering additional argument (but no additional evidence) by Goodwin, R. 11, the

Appeals Council denied review on February 27, 2004.  R. 7.  On April 9, 2004, Goodwin timely

appealed the Appeals Council's decision to deny review to the United States District Court.

Docket No. 1.  On October 14, 2004, Goodwin filed a memorandum of law in support of her

appeal of the denial of review.  Docket No. 23.  On December 13, 2004, the Commissioner filed a

memorandum in support of her decision that Goodwin was not disabled.  Docket No. 24.

On March 16, 2005, Goodwin notified the Court that the Commissioner had found her to

be disabled on a separate claim as of July 24, 2003 — the day after the ALJ's adverse decision on

July 23, 2003 and seven months before the denial of review.  Docket No. 25.  On May 9, 2005, the

Commissioner filed several forms relevant to that determination:  a Disability Determination and Transmittal Form [Docket No. 28, Exhibit 1], and two evaluation forms (a Psychiatric Review Technique form and a Mental Residual Functional Capacity Assessment form) that had been utilized by the state agency psychological consultant who concluded that Goodwin was disabled. Docket No. 28, Exhibit 2.  The appeal is ripe for determination.

## II.   **THE PARTIES' POSITIONS**

Goodwin assigns four errors to the Commissioner.  First, Goodwin claims that the Commissioner erred in failing to find that her various impairments, in combination, met the listing requirement for mental retardation pursuant to §12.05C of the Listings of Impairments.  Second, Goodwin claims that the Commissioner erred by improperly rejecting her subjective complaints of pain.  Third, Goodwin claims that the Commissioner failed to provide a proper explanation for her evaluation of Goodwin's residual functional capacity.  Finally, Goodwin contends that the Commissioner failed to assign proper weight to the opinion of her treating physician..

The Commissioner argues that substantial evidence supports her decision to deny disability.  First, the Commissioner argues that the ALJ properly determined that Goodwin's impairments did not meet *all* of the criteria of Section 12.05C of the Listings, as required for a determination of disability.  Second, the Commissioner argues that substantial evidence supports the ALJ's determination that Goodwin's impairments were less limiting than she claimed.  Third, the Commissioner contends that the ALJ properly explained her assessment of Goodwin's residual functional capacity.  Finally, the Commissioner argues that the opinion of Goodwin's treating physician was not properly supported, and that the ALJ therefore properly rejected it.

-3-

III.    **THE STANDARD OF REVIEW**

A.    **Affirmance**

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405 (g).  Substantial evidence is more than a scintilla — i.e., the evidence must do more than merely create a suspicion of the existence of a fact, and must include such relevant evidence as a reasonable person would accept as adequate to support the conclusion.  *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995), *citing Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982) and *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *accord*, *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991).

Where the Commissioner's decision is supported by substantial evidence, the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision.  *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991).  The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision.  *Foote*, 67 F.3d at 1560; *accord*, *Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (court must scrutinize the entire record to determine reasonableness of factual findings); *Parker v. Bowen*, 793 F.2d 1177 (11th Cir. 1986) (court also must consider evidence detracting from evidence on which Commissioner relied).

B.    **Reversal and Remand**

Congress has empowered the district court to reverse the decision of the Commissioner without remanding the cause.  42 U.S.C. § 405 (g)(Sentence Four).  The district court will reverse

-4-

a Commissioner's decision on plenary review if the decision applies incorrect law, or if the

decision fails to provide the district court with sufficient reasoning to determine that the

Commissioner properly applied the law. *Keeton v. Department of Health and Human Services*, 21

F.3d 1064, 1066 (11th Cir. 1994); *accord Cornelius v. Sullivan*, 936 F.2d 1143, 1145 (11th Cir.

1991); *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  This Court may reverse the

decision of the Commissioner, and order an award of disability benefits, where the Commissioner

has already considered the essential evidence and it is clear that the cumulative effect of the

evidence establishes disability without any doubt. *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir.

1993); *accord, Bowen v. Heckler*, 748 F.2d 629, 631, 636 - 37 (11th Cir. 1984).

    The district court may remand a case to the Commissioner for a rehearing under sentence

four of  42 U.S.C. § 405 (g); under sentence six of 42 U.S.C. § 405 (g); or under both sentences.

*Jackson v. Chater*, 99 F.3d 1086, 1089 - 92, 1095, 1098 (11th Cir. 1996).  To remand under

sentence four, the district court must either find that the Commissioner's decision is not supported

by substantial evidence, or that the Commissioner incorrectly applied the law relevant to the

disability claim. *Jackson*, 99 F.3d at 1090 - 91 (remand appropriate where ALJ failed to develop a

full and fair record of claimant's residual functional capacity); *accord Brenem v. Harris*, 621 F.2d

688, 690 (5th Cir. 1980) (remand appropriate where record was insufficient to affirm, but also was

insufficient for district court to find claimant disabled).

    Where the district court cannot discern the basis for the Commissioner's decision, a

sentence-four remand may be appropriate to allow the Commissioner to explain the basis for his

decision. *Falcon v. Heckler*, 732 F.2d 872, 829 - 30  (11th Cir. 1984) (remand was appropriate to

allow ALJ to explain his basis for determining that claimant's depression did not significantly affect her ability to work) (treating psychologist acknowledged that claimant had improved in response to treatment and could work in a supportive, non-competitive, tailor-made work environment).   On remand under sentence four, the ALJ should review the case on a complete record, including any new material evidence.  *Diorio v. Heckler*, 721 F.2d 726, 729 (11th Cir. 1983) (necessary for ALJ on remand to consider psychiatric report tendered to Appeals Council); *Reeves v. Heckler*, 734 F.2d 519, 522 n.1 (11th Cir. 1984) (ALJ should consider on remand the need for orthopedic evaluation).   After a sentence-four remand, the district court enters a final and appealable judgment immediately, and then loses jurisdiction.  *Jackson*, 99 F.3d at 1089, 1095.

In contrast, sentence six of 42 U.S.C. § 405 (g) provides:

> The court . . . may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon a showing that there is new evidence which is material and that there is good cause for the failure to incorporate such evidence into the record in a prior proceeding;

42 U.S.C. § 405 (g).

To remand under sentence six, the claimant must establish:  1.) that there is new, non-cumulative evidence; 2.) that the evidence is material —  relevant and probative so that there is a reasonable possibility that it would change the administrative result; and 3.) there is good cause for failure to submit the evidence at the administrative level.  *See Jackson*, 99 F.3d at 1090 - 92; *Cannon v. Bowen*, 858 F.2d 1541, 1546 (11th Cir. 1988); *Smith v. Bowen*, 792 F.2d 1547, 1550 (11th Cir. 1986); *Caulder v. Bowen*, 791 F.2d 872, 877 (11th Cir. 1986); *see also Keeton v. Dept. of Health and Human Serv.*, 21 F.3d 1064, 1068 (11th Cir. 1994).

A sentence-six remand may be warranted even in the absence of an error by the

Commissioner if new, material evidence becomes available to the claimant.  *Jackson*, 99 F.3d at

1095.  With a sentence-six remand, the parties must return to the district court after remand to file

modified findings of fact.  *Jackson*, 99 F.3d at 1095.  The district court retains jurisdiction pending

remand, and does not enter a final judgment until after the completion of remand proceedings.[1]  *Id.*

## IV.   THE LAW

The law defines disability as the inability to do any substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less than twelve

months.  42 U.S.C. §§ 416 (i), 423 (d)(1); 20 C.F.R. § 404.1505.  The impairment must be severe,

making the claimant unable to do his or her previous work, or any other substantial gainful activity

which exists in the national economy.  42 U.S.C. § 423 (d)(2); 20 C.F.R. §§ 404.1505 - 404.1511.

### A.   Treating Physicians

Substantial weight must be given to the opinion, diagnosis and medical evidence of a

treating physician unless there is good cause to do otherwise.  *See Lewis v.* Callahan, 125 F.3d

1436, 1439 - 1441 (11th Cir. 1997); *Edwards v. Sullivan*, 937 F.2d 580, 583 (11th Cir. 1991);

*Sabo v. Commissioner of Social Security*,  955 F.Supp. 1456, 1462 (M.D. Fla. 1996); 20 C.F.R. §

404.1527 (d).  If a treating physician's opinion on the nature and severity of a claimant's

---

[1]The time for filing an application for attorneys fees under the Equal Access to Justice Act, 28 U.S.C. § 2412 ["EAJA"] differs in remands under sentence four and sentence six.  *Jackson*, 99 F.3d at 1089, 1095 n.4 and surrounding text.  In a sentence-four remand, the EAJA application must be filed after the entry of judgment before the district court loses jurisdiction.  *Id.*  In a sentence-six remand, the time runs from the post-remand entry-of-judgment date in the district court.  *Id.*

impairments is well-supported by medically acceptable clinical and laboratory diagnostic techniques, and is not inconsistent with the other substantial evidence in the record, the ALJ must give it controlling weight.  20 C.F.R. § 404.1527 (d)(2).  The ALJ may discount a treating physician's opinion or report regarding an inability to work if it is unsupported by objective medical evidence or is wholly conclusory.  *See Edwards*, 937 F.2d 580 (ALJ properly discounted treating physician's report where the physician was unsure of the accuracy of his findings and statements).

Where a treating physician has merely made conclusory statements, the ALJ may afford them such weight as is supported by clinical or laboratory findings and other consistent evidence of a claimant's impairments.  *See Wheeler v. Heckler*, 784 F.2d 1073, 1075 (11th Cir. 1986); *see also Schnor v. Bowen*, 816 F.2d 578, 582 (11th Cir. 1987).  When a treating physician's opinion does not warrant *controlling* weight, the ALJ must nevertheless weigh the medical opinion based on the 1.) length of the treatment relationship and the frequency of examination; 2.) the nature and extent of the treatment relationship; 3.) the medical evidence supporting the opinion; 4.) consistency with the record a whole; 5.) specialization in the medical issues at issue; 6.) other factors which tend to support or contradict the opinion.  20 C.F.R. § 404.1527 (d).  However, a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion.  *See Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir.1984); *see also* 20 C.F.R. § 404.1527 (d)(2).

The ALJ is required to review all of the medical findings and other evidence that support a medical source's statement that a claimant is disabled.  However, the ALJ is responsible for

making the ultimate determination about whether a claimant meets the statutory definition of disability.  20 C.F.R. § 404.1527 (e).   The ALJ is not required to give any special significance to the status of a physician as treating or non-treating in weighing an opinion on whether the claimant meets a listed impairment, a claimant's residual functional capacity (*see* 20 C.F.R. §§ 404.1545 and 404.1546), or the application of vocational factors because that ultimate determination is the providence of the Commissioner.  20 C.F.R. § 404.1527 (e).

> **B.**      **Developing the Record**

The ALJ has a duty to fully and fairly develop the record.  *Welch v. Bowen*, 854 F.2d 436, 438 (11th Cir. 1988); *Cowart v. Schweiker*, 662 F.2d 731, 735 - 36 (11th Cir. 1981).  The Commissioner also has a duty to notify a claimant of the statutory right to retained counsel at the social security hearing, and to solicit a knowing and voluntary waiver of that right.  *See* 42 U.S.C.§ 406; *Cowart*, 662 F.2d at 734.  The obligation to fully and fairly develop the record exists if a claimant has waived the right to retained counsel, and even if the claimant is represented by counsel.  *See Cowart*, 662 F.2d at 735 - 36.  However, where an unrepresented claimant has not waived the right to retained counsel, the ALJ's obligation to develop a full and fair record rises to a special duty.  *See Brown v. Shalala*, 44 F.3d 931, 934 - 35 (11th Cir. 1995), *citing Smith v. Schweiker*, 677 F.2d 826, 829 (11th Cir. 1982).  This special duty requires the ALJ to "scrupulously and conscientiously probe into, inquire of, and explore for all the relevant facts" and to be "especially diligent in ensuring that favorable as well as unfavorable facts and circumstances are elicited." *Cowart*, 662 F.2d at 735 (citations omitted).

### C.     Medical Tests and Examinations

The ALJ is required to order additional medical tests and exams only when a claimant's medical sources do not give sufficient medical evidence about an impairment to determine whether the claimant is disabled.  20 C.F.R. § 416.917; *see also Conley v. Bowmen*, 781 F.2d 143, 146 (8th Cir. 1986).  In fulfilling his duty to conduct a full and fair inquiry, the ALJ is not required to order a consultative examination unless the record establishes that such an examination is necessary to enable the ALJ to render an informed decision.  *Holladay v. Bowen*, 848 F.2d 1206, 1209 (11th Cir. 1988); *Reeves v. Heckler*, 734 F.2d 519, 522 n. 1 (11th Cir. 1984) (failure to order such an evaluation may be reversible error).  Under the regulations, however, the ALJ may determine that a consultative examination or other medical tests are necessary.  20 C.F.R. § 416.917 (1998).

### D.     The Five Step Evaluation

The ALJ must follow five steps in evaluating a claim of disability.  *See* 20 C.F.R. §§ 404.1520,  416.920.  First, if a claimant is working at a substantial gainful activity, she is not disabled.  20 C.F.R. § 404.1520 (b).  Second, if a claimant does not have any impairment or combination of impairments which significantly limit his or her physical or mental ability to do basic work activities, then she does not have a severe impairment and is not disabled.  20 C.F.R. § 404.1520 (c).  Third, if a claimant's impairments meet or equal an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1, she is disabled.  20 C.F.R. § 404.1520 (d).  Fourth, if a claimant's impairments do not prevent him or her from doing past relevant work, she is not disabled.  20 C.F.R. § 404.1520 (e).  Fifth, if a claimant's impairments (considering his or her

residual functional capacity, age, education, and past work) prevent him or her from doing other work that exists in the national economy, then claimant is disabled.  20 C.F.R. § 404.1520 (f).

In determining whether a claimant's physical and mental impairments are sufficiently severe, the ALJ must consider the combined effect of all of the claimant's impairments, and must consider any medically severe combination of impairments throughout the disability determination process.  42 U.S.C. § 423 (d)(2)(B).  The ALJ must evaluate a disability claimant as a whole person, and not in the abstract as having several hypothetical and isolated illnesses.  *Davis v. Shalala*, 985 F.2d 528, 534 (11th Cir. 1993).  Accordingly, the ALJ must make specific and well-articulated findings as to the effect of a combination of impairments when determining whether an individual is disabled.  *See id.*, 985 F.2d at 534.

The claimant has the burden of proving the existence of a disability as defined by the Social Security Act.  *Carnes v. Sullivan*, 936 F.2d 1215, 1218 (11th Cir. 1991).  The claimant must prove disability on or before the last day of his or her insured status for the purposes of disability benefits.  *Ware v. Schweiker*, 651 F.2d 408, 411 (5th Cir. 1981); *Demandre v. Califano*, 591 F.2d 1088, 1090 (5th Cir. 1979); 42 U.S.C. §§ 416 (i)(3); 423(a), (c).  If a claimant becomes disabled after the claimant has lost insured status, his or her claim for disability benefits must be denied despite the disability.  *See, e. g., Kirkland v. Weinberger*, 480 F.2d 46 (5th Cir. 1973); *Chance v. Califano*, 574 F.2d 274 (5th Cir. 1978).

### E.   The Evaluation of Mental Disorders

The evaluation of disability on the basis of mental disorders requires the documentation of a medically determinable impairment, as well as consideration of the degree of limitation such

impairment may impose on the individual's ability to work.  The listings for mental disorders are arranged in nine diagnostic categories.  20 C.F.R. Pt. 404, Subpt. P, App. 1.   The criteria in paragraphs B and C of the listings for mental disorders describe those functional limitations associated with mental disorders which are incompatible with the ability to work — i.e. limitations in functional areas deemed essential to work.  A mental impairment is medically equivalent to a listed mental impairment if the medical findings are at least equal in severity and duration to the listed findings.  20 C.F.R. § 404.1526.  An individual meeting or equaling the criteria could not reasonably be expected to engage in gainful work activity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Individuals who have an impairment with a level of severity which does not meet the criteria of the listings for mental disorders may or may not have the residual functional capacity ["RFC"] which would enable them to engage in substantial gainful work activity.  The determination of mental RFC is crucial to the evaluation of an individual's capacity to engage in substantial gainful work activity when the criteria of the listings for mental disorders are not met or equaled, but the impairment is nevertheless severe.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

For mental disorders, severity is assessed in terms of the functional limitations imposed by the impairment.  Functional limitations are assessed using the criteria in paragraph B of the listings for mental disorders (activities of daily living; social functioning;  concentration, persistence, or pace;  and ability to tolerate increased mental demands associated with competitive work).  A "marked" degree of limitation means more than moderate, but less than extreme.  A marked limitation may arise when several activities or functions are impaired or even when only one is

impaired, so long as the degree of limitation is such as to seriously interfere with the ability to function independently, appropriately and effectively.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The Commissioner employs a technique to ensure that ALJ's obtain, consider, and properly evaluate all evidence needed to evaluate mental impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The technique is used in connection with the sequential evaluation process.  *See* 20 C.F.R. §§ 404.1520a and 416.920a.

The presence of a mental disorder should be documented primarily on the basis of reports from individual providers, such as psychiatrists and psychologists, and facilities such as hospitals and clinics.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Information from both medical and non-medical sources may be used to obtain detailed descriptions of the individual's activities of daily living; social functioning;  concentration, persistence and pace;  or ability to tolerate increased mental demands (stress).  This information can be provided by programs such as community mental health centers, day care centers, and family members who have knowledge of the individual's functioning.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In some cases descriptions of activities of daily living or social functioning given by individuals or treating sources may be insufficiently detailed and/or may be in conflict with the clinical picture otherwise observed or described in the examinations or reports.  It is necessary to resolve any inconsistencies or gaps that may exist in order to obtain a proper understanding of the individual's functional restrictions.

An individual's level of functioning may vary considerably over time.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The level of functioning at a specific time may seem relatively adequate or, conversely, rather poor.  Proper evaluation of the impairment must take any variations in level of

functioning into account in arriving at a determination of impairment severity over time.  20

C.F.R. Pt. 404, Subpt. P, App. 1.  Thus, it is vital to obtain evidence from relevant sources over a

sufficiently long period prior to the date of adjudication in order to establish the individual's

impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  This evidence should include treatment

notes, hospital discharge summaries, and work evaluation or rehabilitation progress notes if these

are available.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Some individuals may actually have worked

during the period of time pertinent to the determination of disability.  Information concerning the

individual's behavior during any attempt to work and the circumstances surrounding termination

of the work effort are particularly useful in determining the individual's ability or inability to

function in a work setting.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

Particular problems are often involved in evaluating mental impairments in individuals

who have long histories of repeated hospitalizations or prolonged outpatient care with supportive

therapy and medication.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  Individuals with chronic psychotic

disorders commonly have their lives structured in such a way as to minimize stress and reduce

their signs and symptoms.  Such individuals may be much more impaired for work than their signs

and symptoms would indicate.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  The results of a single

examination may not adequately describe these individuals' sustained ability to function.  It is,

therefore, vital to review all pertinent information relative to the individual's condition, especially

at times of increased stress.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  It is mandatory to attempt to

obtain adequate descriptive information from all sources which have treated the individual either

currently, or in the time period relevant to the decision.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

-14-

Attention must be given to the effect of medication on the individual's signs, symptoms and ability to function.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  While psychotropic medications may control certain primary manifestations of a mental disorder, e.g., hallucinations, such treatment may or may not affect the functional limitations imposed by the mental disorder.  20 C.F.R. Pt. 404, Subpt. P, App. 1.  In cases where overt symptomatology is attenuated by the psychotropic medications, particular attention must be focused on the functional restrictions which may persist. These functional restrictions are also to be used as the measure of impairment severity.  20 C.F.R. Pt. 404, Subpt. P, App. 1.

In some cases, the evidence shows that an individual's impairments are subject to temporary remission.  In assessing whether medical improvement has occurred in persons with this type of impairment, the ALJ will consider the longitudinal history of the impairments, including the occurrence of prior remission, and prospects for future worsening.  Improvement in such impairments that is only temporary will not warrant a finding of medical improvement.  20 C.F.R. § 404.1594 (iv).

An individual may meet the separate Listing for mental retardation if he or she has a valid verbal, performance, or full scale IQ of 60 through 70, and a physical or other mental impairment imposing additional and significant work-related limitation of function.  20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

### F.   <u>Other Work</u>

Once the ALJ finds that a claimant cannot return to his or her prior work, the burden of proof shifts to the Commissioner to establish that the claimant could perform other work that

exists in the national economy. *Foote v. Chater*, 67 F.3d 1553, 1559 (11th Cir. 1995).  In determining whether the Commissioner has met this burden, the ALJ must develop a full record regarding the vocational opportunities available to a claimant. *Foote*, 67 F.3d at 1558; *Allen v. Sullivan*, 880 F.2d 1200, 1201 (11th Cir. 1989).  This burden may sometimes be met through exclusive reliance on the Medical-Vocational Guidelines [the "grids"]. *Foote,* 67 F.3d at 1558. Exclusive reliance on the "grids" is appropriate where the claimant suffers primarily from an exertional impairment, without significant non-exertional factors.  20 C.F.R. Part 404, Subpart P, Appendix 2, § 200.00 (e); *Foote*, 67 F.3d at 1559; *Heckler v. Campbell*, 461 U.S. 458 (1983) (exclusive reliance on the grids is appropriate in cases involving only exertional impairments, impairments which place limits on an individual's ability to meet job strength requirements).

Exclusive reliance is not appropriate "either when a claimant is unable to perform a full range of work at a given residual functional level or when a claimant has a non-exertional impairment that significantly limits basic work skills." *Walker v. Bowen*, 826 F.2d 996, 1002-03 (11th Cir. 1987).  In almost all of such cases, the Commissioner's burden can be met only through the use of a vocational expert. *Foote*, 67 F.3d at 1559; *Chester v. Bowen*, 792 F.2d 129, 132 (11th Cir. 1986); *see also MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986) (when non-exertional limitations are alleged, the preferred method of demonstrating that the claimant can perform specific work is through the testimony of a vocational expert).  It is only when the claimant can clearly do unlimited types of work at a given residual functional level that it is unnecessary to call a vocational expert to establish whether the claimant can perform work which exists in the national economy.  *See Allen v. Sullivan*, 880 F.2d 1200, 1202 (11th Cir. 1989);

-16-

*Ferguson v. Schweiker*, 641 F.2d 243, 248 (5th Cir. 1981).  In any event, the ALJ must make a

specific finding as to whether the non-exertional limitations are severe enough to preclude a wide

range of employment at the given work capacity level indicated by the exertional limitations.

*Foote*, 67 F.3d at 1559.

       1.    **Pain**

Pain is a non-exertional impairment.  *Foote*, 67 F.3d at 1559; 826 F.2d at 1003.  Congress

has determined that a claimant will not be considered disabled unless he furnishes medical and

other evidence (e.g., medical signs and laboratory findings) showing the existence of a medical

impairment which could reasonably be expected to produce the pain or symptoms alleged.  42

U.S.C. § 423 (d)(5)(A).  The ALJ must consider all of a claimant's statements about his

symptoms, including pain, and determine the extent to which the symptoms can reasonably be

accepted as consistent with the objective medical evidence.  20 C.F.R. § 404.1528.  In

determining whether the medical signs and laboratory findings show medical impairments which

reasonably could be expected to produce the pain alleged, the ALJ must apply the Eleventh

Circuit's three-part "pain standard":

> The pain standard requires (1) evidence of an underlying medical condition and
> either (2) objective medical evidence that confirms the severity of the alleged pain
> arising from that condition or (3) that the objectively determined medical condition
> is of such a severity that it can be reasonably expected to give rise to the alleged
> pain.

*Foote,* 67 F.3d at 1560, *quoting Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991).  Pain

alone can be disabling, even when its existence is unsupported by objective evidence, *Marbury v.*

*Sullivan*, 957 F.2d 837, 839 (11th Cir. 1992), although an individual's statement as to pain is not, by itself, conclusive of disability.  42 U.S.C. § 423 (d)(5)(A).

### 2.    Credibility

Where an ALJ decides not to credit a claimant's testimony about pain, the ALJ must articulate specific and adequate reasons for doing so, or the record must be obvious as to the credibility finding.  *Foote,* 67 F.3d at 1561-62*; Jones v. Department of Health and Human Services*, 941 F.2d 1529, 1532 (11th Cir. 1991) (articulated reasons must be based on substantial evidence).  A reviewing court will not disturb a clearly articulated credibility finding with substantial supporting evidence in the record.  *See Hale v. Bowman,* 831 F.2d 1007, 1012 (11th Cir. 1987); *MacGregor v. Bowen*, 786 F.2d 1050, 1054 (11th Cir. 1986).  As a matter of law, the failure to articulate the reasons for discrediting subjective pain testimony requires that the testimony be accepted as true.  *Foote,* 67 F.3d at 1561-62*; Cannon v. Bowen*, 858 F.2d 1541, 1545 (11th Cir. 1988).

A lack of a sufficiently explicit credibility finding becomes a ground for remand when credibility is critical to the outcome of the case.  *See Smallwood v. Schweiker*, 681 F.2d 1349, 1352 (11th Cir. 1982).  If proof of disability is based on subjective evidence and a credibility determination is, therefore, critical to the decision, "the ALJ must either explicitly discredit such testimony or the implication must be so clear as to amount to a specific credibility finding." *Foote v. Chater*, 67 F.3d at 1562 (quoting *Tieniber v. Heckler*, 720 F.2d 1251, 1255 (11th Cir.1983) (although no explicit finding as to credibility is required, the implication must be obvious to the reviewing court).

V.     **APPLICATION AND ANALYSIS**

  A.     **The Facts**

On April 1, 2000, Goodwin was admitted to Memorial Hospital/Ormond due to a near syncopal[2] episode.  She also had a tingling sensation and loss of power on the left arm.  An MRI, performed due to weakness in the left arm, revealed an acute infarction[3] involving the right middle cerebral artery territory.  Her weakness in her arm persisted throughout her hospitalization.  She was discharged on April 23, 2000 with a diagnosis of acute cerebrovascular accident, left lower lobe pneumonia, hypertension, history of smoking with possible chronic obstructive pulmonary disease, and a history of syncope related to acute cerebrovascular accident.  R. 98.

On August 21, 2001, Goodwin complained to Stanley Stockhammer, Jr., M.D. of a very painful and swollen right foot.  R. 114.  On October 2, 2001, Goodwin complained to Dr. Case Stockhammer that her right arm was "very weak" and that it had progressively weakened over the preceding months.  R. 113.

Goodwin saw John A. Ortolani, M.D. on November 6, 2001.  He stated that since her cerebrovascular accident on April 1, 2001,[4] she had had facial drooping, forgetfulness, left hand weakness and balance difficulties.  She stated that her right side now seems to be affected.

---

[2] Relating to loss of consciousness and postural tone caused by diminshed cerebral blood flow.  STEDMAN'S MEDICAL DICTIONARY 1720 (26th ed. 1995) [hereinafter "STEDMAN'S"].

[3] Sudden insufficiency of arterial or venous blood supply due to emboli, thrombi, vascular torsion, or pressure that produces a macroscopic area of necrosis.  STEDMAN'S at 868.

[4] Other records indicate that Goodwin's CVA occurred in 2000, not 2001.  *See*, *e.g.*, R. 98.

Cerebellar tests showed that rapid alternating movement of left arm and hand was impaired, finger to nose testing was somewhat impaired on the left,and tandem gait was difficult.  R. 133.

On November 20, 2001, Dr. Ortolani noted receipt of Goodwin's hospitalization records. He stated that her MRI was consistent with an acute cerebrovascular accident.  He was concerned about complaints of progression of her symptoms, which included involvement of her right hand. He ordered an MRI of her brain to evaluate a cerebral lesion.  He also ordered an MRI of her cervical spine due to concerns over the numbness she was developing in both hands  R. 131.

An MRI of the brain on December 12, 2001 by Michael P. O'Neill, M.D. revealed interval development of large areas of encephalomalacia[5] that involved the right frontal parietal lobe.  An earlier MRI had showed smaller areas, consistent with subacute cortical and subcortical infarcts. This had progressed to involve the majority of the right frontal and parietal cortex.  The MRI also showed some stable areas of encephalomalacia that involved the right posterior temporal occipital lobe consistent with remote infarction and right hemispheric volume loss with left to right midline shift and abnormal lack of flow within the right cavernous internal carotid artery.  R. 134 - 35.  An MRI of the cervical spine indicated mild to moderate diffuse cervical spondylosis[6] and a mild posterior broad-based spondylitic bulge at the C4-5, C5-6 and C6-7 levels.  It also indicated a small posterior central disc protrusion-herniation at the C3-4 level, ventral thecal sac indentation, posterior broad-based spondylitic bulge at C6-7 level, focal disc space narrowing, right lateral access narrowing, and right medial foraminal narrowing.  R. 136.

---

[5] Abnormal softness of the cerebral parenchyma often due to ischemia or infarction.  STEDMAN'S at 565.

[6] Stiffening or fixation of the vertebra, often applied nonspecifically to any lesion of the spine of a degenerative nature.  STEDMAN'S at 1656.

-20-

On January 7, 2002, Dr. Ortolani reviewed Goodwin's MRI exams, noting that the cervical spine MRI showed significant degenerative change but no high-grade stenosis that might cause weakness in both hands.  He also noted that her brain MRI showed a large area of infarction and opined that her hand weakness and problems with gait and balance were all related to that.  He noted that she suffered from degenerative disease of the neck that caused severe pain.  Dr. Ortolani opined that between her problems with memory and concentration, balancing and walking, and left side weakness, she was incapable of any type of gainful employment.  R. 130.

On April 17, 2002, Dr. Ortolani completed an assessment for DDS.  He noted she had a herniated disc at C3-4, weakness in both hands indicated by a 4/5 grip strength, weakness in her right leg indicated by 4/5 motor strength and a slight limp in her right leg.  She could not squat.  R. 128.

Michael K. West, Psy.D. performed a psychological evaluation on April 23, 2002.  He described Goodwin's psychiatric prognosis as "unclear."  He opined that appeared to be experiencing depression relating to the effects of her two CVAs or due to direct psychological influence of the strokes.  She appeared to have "mood difficulties," but Dr. West opined that her daily functioning was primarily impacted by her physical issues.  R. 139.  Goodwin went to Halifax Medical Center on March 18, 2003.  She complained of vertigo.  She was diagnosed with upper respiratory infection and bronchospasm.  R. 216.

On June 5, 2003, Bruce G. Borkosky, Psy.D. performed a psychological evaluation on Goodwin.  To determine Goodwin's general intellectual ability, Dr. Borkosky administered the WAIS-III test to her.  As measured by the WAIS-III, Goodwin's general cognitive ability was in the

"Extremely Low" range of intellectual functioning.  Dr. Borkosky noted that Goodwin might

experience "great difficulty in keeping up with her peers in a wide variety of situations that require

age appropriate thinking and reasoning abilities."  Dr. Borkosky administered 11 subtests of the

WAIS-III, including the VIQ, which measures acquired knowledge, verbal reasoning and

comprehension of verbal information.  Goodwin's verbal reasoning abilities were in the "Extremely

Low" range, and Dr. Borkosky noted that all of her verbal abilities were below those of most of her

peers.  Goodwin also took the PIQ subtest, which provides an indication of one's nonverbal ability

to learn new material.  Her nonverbal reasoning abilities were in the "Borderline" range and better

than those of only 2 percent of her peers.  Summing up the results of WAIS-III intellectual abilities

tests, Dr. Borkosky noted that, relative to her peers, Goodwin exhibited less well developed

abilities across all domains.  R. 217 - 20.

According to the Working Memory Index of WMS-III, Goodwin experienced difficulty

holding auditory and visual-spatial information in temporary storage and experienced a rapid loss

of relevant information required to accurately perform mental operation at the level of her peers.

She scored in the "Borderline" range, exceeding only 3 percent of her peers.  Dr. Borkosky noted

that in situations that required Goodwin to remember new information, she may experience

difficulty.  He also noted that her low performance on immediate memory measures may negatively

affect functioning in daily living and other cognitive domains relative to the performance of her

peers.  Goodwin had a slower than average rate of learning, and her initial acquisition of auditory

information after a single presentation and after multiple trials was in the "Low Average" range.

Her overall delayed memory capabilities were in the "Borderline" classification range.  R. 220 - 22.

Goodwin received a Verbal IQ score of 66, a Performance IQ score of 70 and a Full Scale IQ score of 65.  R. 228.

In summarizing the WAIS-III results, Dr. Borkosky described Goodwin's prognosis as "fair," stating that, in terms of functional ability, "she had a good ability to understand, a good ability to remember and carry out instructions, and a fair ability to respond appropriately to supervision, coworkers, and work pressures.  R. 226.  On June 5, 2003, Dr. Borkosky also filled out a "Medical Source Statement of Ability to do Work-Related Activities (Mental)".  R. 235.  He opined that Goodwin's impairment affected her ability to understand, remember, and carry out instructions.  R. 235.  He indicated that she suffered slight restrictions in every listed category (i.e., ability to understand and remember short, simple instructions; to carry out short, simple instructions; to understand and remember detailed instructions; to carry out detailed instructions; in her ability to make judgments on simple work-related decisions; to interact appropriately with the public, with supervisors, and with co-workers; to respond appropriately to work pressures in a usual work setting; and to respond appropriately to changes in a routine work setting).  R. 235 - 36.  Though the form requested that he do so, Dr. Borkosky did not list the evidence supporting this assessment.  R. 235 - 36.

**B.     The Analysis**

Goodwin first argues that the ALJ erred by failing to conclude that she met the criteria of Section 12.05C of Listings of Impairments.  Section 12.05 provides, in pertinent part:

> 12.05   Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

-23-

The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.

*          *          *

C.       A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.05.

Referring to the results of her WAIS-III test, Goodwin reports that she had a "Verbal IQ score of 66, a Performance IQ score of 70 and a Full Scale IQ score of 60 [sic]."[7]  Docket 23 at 6. Therefore, she continues, she met "the first prong of Listing 12.05C."  Docket 23 at 6.  Goodwin also lists her various physical ailments — such as cervical spondylosis, R. 136, and degenerative disease of the neck, R. 130 — and states that, based on this evidence, she "clearly [had] an impairment imposing an additional and significant work-related limitation of function, and as such, . . . met both prongs of Listing 12.05C."  Docket 23 at 6 - 7.  Goodwin's argument fails, however, for two reasons.  As the introduction to Section 12 of the Listings makes clear, meeting the requirements of paragraph C, alone, will not support a finding of disability:

The structure of the listing for mental retardation (12.05) is different from that of the other mental disorders listings. Listing 12.05 contains an introductory paragraph with the diagnostic description for mental retardation. It also contains four sets of criteria (paragraphs A through D). If your impairment satisfies the diagnostic description in the introductory paragraph **and** any one of the four sets of criteria, we will find that your impairment meets the listing.

20 C.F.R. Pt. 404, Subpt. P, App. 1, § 12.00 (emphasis added).

---

[7]Actually, Dr. Borkosky reported that Goodwin received a Full Scale IQ score of 65.  R. 228.

Goodwin has failed to demonstrate that she satisfies the requirements of the introductory paragraph, as she has not demonstrated the requisite "deficits in adaptive functioning."  Dr. Borkosky concluded that Goodwin had "Borderline Intellectual Functioning," not mental retardation.  R. 226.  Neither he nor any other examiner diagnosed Goodwin as having that condition or as suffering the sorts of adaptive functioning deficits that might satisfy the diagnostic description for mental retardation.  As the ALJ notes, Dr. Borkosky opined that Goodwin's cognitive difficulties imposed only slight limitations.  R. 235 - 36.

Even if she had met the requirements set forth in the introductory paragraph, Goodwin has not demonstrated that she satisfied the requirements of paragraph C.  She has not shown that she then suffered from "an additional and significant work-related limitation of function" resulting from an impairment other than mental retardation.  Although she lists numerous impairments that could conceivably result in such a limitation, Docket 23 at 6 - 7, she does not point to any evidence that any of them had actually caused such a result at the time of the ALJ's decision.

Goodwin also argues that the ALJ failed to consider her impairments in combination. Docket 23 at 7 - 8.  However, the ALJ wrote that Goodwin's "other impairments" did not impose work-related limitations, suggesting just the opposite.  In any event, Goodwin fails to point to anything in the record suggesting that consideration of her impairments in combination would lead to a different conclusion, and the Court's own review has not turned up any evidence supporting such a conclusion.

Goodwin next argues that the ALJ improperly failed to properly consider her subjective complaints of pain.  Docket 23 at 8.  Goodwin does not quote or cite to the particular complaints of

pain that she contends were improperly evaluated.  She does list medical evidence of conditions that could result in pain, Docket 23 at 9, but she makes no effort to explain how that evidence either confirms the severity of the alleged pain or shows that her condition could reasonably be expected to give rise to the alleged pain, as required by the Eleventh Circuit pain standard.  She does not contradict (or even address) the ALJ's discussion, R. 20, of the inconsistency between Goodwin's testimony and the medical evidence, which supports the ALJ's decision.  In short, Goodwin has provided no basis upon which this Court might conclude that the ALJ and Appeals Counsel failed to give due consideration to her subjective complaints.[8]

Goodwin next argues that the ALJ failed to comply with Social Security Ruling 96-8p. Goodwin contends that the ALJ's RFC finding failed to include the required "function by function assessment based upon all of the relevant evidence of an individual to do work-related activities." Docket 23 at 10.  Goodwin also contends that the ALJ failed to discuss her ability to perform sustained work activities, instead merely stating that she had the ability to perform sedentary work. Docket 23 at 10 - 11.  This is incorrect.  The ALJ concluded that Goodwin retained the capability to perform sedentary work, and then described her functional capacities — for example, that she could occasionally lift or carry up to ten pounds, and that she could sit for about six hours of an eight-hour work day  R. 20.  The ALJ based this conclusion on the opinions of a consulting physician who opined that Goodwin could perform light work; the ALJ found the consulting physician's opinion "somewhat optimistic" in that Goodwin suffered dizziness, headaches, and left arm and

---

[8] Similarly, Goodwin's argument that her persistent efforts to obtain relief from pain should enhance her credibility, Docket 23 at 9 - 10, must fail in that she does not detail those efforts, leaving the Court unable to evaluate them.  The ALJ's evaluation of Goodwin's credibility is supported by substantial evidence.  Goodwin's pain-relief efforts do not lead to a different result.

hand weakness, and therefore concluded that Goodwin could only perform sedentary work, not light work.  R. 20.  Goodwin does not complain that the opinion of the consulting physician is insufficient to support a finding that she could perform either light work or sedentary work.

Finally, Goodwin complains that the ALJ improperly failed to give substantial weight to the January 2002 opinion of her treating physician, Dr. Ortolani, that she was incapable of work-related activities.  Docket 23 at 11.  Goodwin contends that the ALJ failed to provide adequate reasons for discounting that opinion.  Docket 23 at 11.  According to Goodwin, the ALJ discounted Dr. Ortolani's opinion "because it was based on subjective complaints of memory and concentration problems as well as physical problems with balance and walking."  Docket 23 at 11.  Goodwin contends that Dr. Ortolani based his opinion on her cervical spine and brain MRIs, and that his report does not indicate that he based it, in any way, on her subjective complaints.  Docket 23 at 11.

Contrary to Goodwin's assessment, Dr. Ortolani references several subjective complaints before providing the opinion at issue, stating that "[b]etween her problems with memory and concentration, balance and walking, and left-sided weakness, I do not feel this patient is capable of any type of gainful employment."  R. 130.  Although Dr. Ortolani does state elsewhere in the report that Goodwin's cervical spine MRI showed "significant degenerative change" and that her brain MRI showed "a large area of infarction," he does not indicate that the MRIs served as the basis for his assessment of Goodwin's memory, concentration, balance, walking, and left-sided weakness issues.  So far as the record discloses, Dr. Ortolani did not perform (or refer to) any sort of testing of Goodwin's memory or concentration.  His assessment of those areas was based on her subjective complaints.

-27-

Of course, the decision as to whether a claimant is disabled is reserved for the Commissioner.  Moreover, as the ALJ noted, the other evidence in the record does not support the assessments that Dr. Ortolani based on Goodwin's subjective complaints.  R. 20.  Dr. Borkosky's tests revealed only slight memory and concentration problems.  R. 235 - 36.  The only treatment for dizziness reflected in the record occurred while Goodwin in March 2003 when she was suffering from an upper respiratory infection.  R. 216.  Goodwin's walking problems did not then require an assistive device.  The ALJ provided adequate reasons for discounting Dr. Ortolani's opinion.

Neither is any error apparent from the Commissioner's finding that Goodwin was not disabled on July 23, 2003 and that she was disabled the next day.  The medical conditions underlying the finding that Goodwin became disabled as of July 24, 2003 — an amnestic disorder, depression, and anxiety — are different from the medical conditions at issue in this case (cervical spondylosis, asthma, hypertension, status post-CVA, mental retardation, neck pain, vertigo). Moreover, the finding of disability is based on medical records obtained in 2004, and never submitted to the ALJ or Appeals Council in this case.  The disability finding and related documentation does not support Goodwin's contention that the ALJ or Appeals Council erred in concluding that she was not disabled prior to July 24, 2003.

## VI.    CONCLUSION

For the reasons stated above, the decision of the Commissioner is **AFFIRMED**.  The Clerk

is directed to enter a judgment.

**DONE AND ORDERED** this 22nd day of June, 2005.

JAMES G. GLAZEBROOK
UNITED STATES MAGISTRATE JUDGE

The Court Requests that the Clerk
Mail or Deliver Copies of this Order to
All Counsel of Record and *Pro Se* Litigants,
and to:

Mary Ann Sloan, Chief Counsel
Dennis R. Williams, Deputy Chief Counsel
Paul Jones, Assistant Regional Counsel
Office of the General Counsel, Region IV
Social Security Administration
61 Forsyth Street, S.W., Suite 20T45
Atlanta, Georgia       30303-8920

Susan Roark Waldron
Assistant United States Attorney
400 N. Tampa St., Suite 3200
Tampa, FL              33602

The Honorable Philemina Jones
Administrative Law Judge
c/o Social Security Administration
Office of Hearings and Appeals
Suite 300, Glenridge Building
3505 Lake Lynda Drive
Orlando, FL            32817